Good morning. May it please the court, Bill Woodson for Mr. Rodriguez and Mr. Guitron. In around March of 2005, an email comes in to the City of Colton indicating that the Bacter crew is hanging around the grade school, either gawking at the moms or the children. Now the City of Colton is presented with a number of options. If they intend to consider some sort of discipline, they are required to go through a process of progressive discipline. These are long-term employees and they are represented by a memorandum of understanding and unions and all that sort of stuff. But instead of going through any process like that, the City of Colton institutes a video surveillance program costing the citizens of Colton $13,000 over a series of three days. They not once go to these men and say something like, hey, you know what, we got a complaint from a citizen that suggests that you guys are fiddling around or wasting time or doing something that has alarmed the citizen. Would you mind explaining to us what you're doing? Instead, they not only go through the video surveillance of three days, they conclude by that video surveillance without speaking to these men at all, getting any explanation from them about what they were up to, whether they were instructed to do business the way they did by their supervisor, Mr. Woodstock, or by his supervisor, Billy Roth. Or by another supervisor named Mike Perales. They did not speak to anyone. They got their video surveillance. They dropped charges to terminate, not once having spoken to anyone, anyone about this. Now, okay, here's your notice to terminate. Show up at the Scali hearing. Myself and a union rep show up and argue their position. The city is so incensed by the argument that these men may have been instructed to do what they were doing, that they had a legitimate explanation for being in front of the grade school. They had lots of things to say, and apparently the impassioned plea by the IBEW people really irked the city. In fact, that's the word used by Anthony Arroyo in his deposition. Both Mr. Parrish, the city manager, Anthony Arroyo, and Mr. Frazier himself were so upset by the stance taken at the Scali hearing that they decided not even to investigate anything said at the Scali hearing. So now, not only do they not hear from these men at all before they start their investigation that has a foregone conclusion in mind, but even after getting their explanations at the Scali hearing, they do absolutely nothing because they're angry, they're irked, they're offended that these men would try to defend themselves. They fire him. I take Mr. Frazier's deposition. One key question. Mr. Frazier, you get this email. You get this email that says, hey, these guys are goofing off. We're alarmed. Why don't you just call them in and find out what's going on? You know these men are entitled to progressive discipline. Why don't you just find out from them what they're up to? Why don't you even talk to Mr. Woodstock, their supervisor, or Mr. Perales, or Mr. Roth? You, the manager of the whole thing, decide. And his answer, which was a non sequitur, but I highlight this in my reply brief, I think is incredibly telling about what's going on in this case. He says, and this is at pages 528 and 529 of the record, quite frankly, if those guys had come clean at that Scali hearing, I probably would have supported keeping them on, maybe demoted them. Or given them some days off without pay or something. If they would have came up and said, hey, I screwed up. I'm sorry. I know I've been doing the city wrong. I'm going to do the right thing. I'm going to change how I do things. But that wasn't the attitude they had at all. They came in just swinging. You know, that we were the problem. That we were the, yeah, the city was the problem. And it wasn't them at all and all this other stuff. And here's the key sentence. I mean, there's a part of me. Remember the question was, why didn't the city use, why didn't you use progressive discipline? There's a part of me that will sit there and take a look at that, but they didn't give me that opportunity. He said a lot here. First of all, it's not an answer to my question. Why didn't you use progressive discipline? He jumps to the Scali hearing where they've already determined they're going to terminate him, terminate these guys and says, they didn't give me a chance to consider lesser punishment. Maybe I missed it in the record. And so it would be helpful to me if you could point me to why the employer was obligated when they got a report from an independent citizen saying this looks odd to me. And they chose to investigate it by observing what these employees were doing. And the evidence that revealed showed that they were affirmatively misrepresenting on their timesheets the amount of time they were working compared to what was depicted in the surveillance tape. And there's also in the record an indication that once it was looked into, their yearly productivity of a four-man team was no greater than another's monthly productivity of a two-man team. If you have that kind of discrepancy in someone's work performance, where is it that they were required to give them a notice saying, oh, you're being bad, do better? Is that a contractual requirement they had? No MOU defines what progressive discipline is to look like except that. Almost every one of them, and this one as well, talks about a verbal write-up, another write-up, and then termination. Something like that. And the MOU in this case is in the record. You can see that it requires progressive discipline. But your question is more particular, and I appreciate that. A juror would be interested, very interested, in did you treat these men in some fashion differently from the way you would ordinarily do business in any other case? Right. And the gravamen of your complaint here is that it was racially oriented, but the team is not all of one race. And everybody on the team was treated the same way. Yes, but the team, the team had three Hispanics and one white. And my point in response to your question would be... There were five people on the team. Well, the supervisor is Mr. Woodstock. There were four operators, three of which remain alive today. One of the operators passed away in a motorcycle accident. That's neither here nor there. So you've got two Hispanics and one Caucasian that remained, or that remained to prosecute the case. But the question, the specific question, Judge Bentravango, you want an answer to is, is it the end of the discussion or is some further investigation required? And I agree with you. If you just look at the video and you look at the logs, you could draw all kinds of conclusions from that. One of the most dramatic of which is, how much time are these guys being told they're entitled to for breaks? We can't lose mind of the fact that these guys are cleaning sewers all day. And when you take a break and want to eat a meal or get a cup of coffee or do something, you cannot just take your break and walk off and get some food. You have to go through a fairly rigorous process of cleaning yourself up. For that reason, the supervisor gave these guys lots of discretion. And this is in the record. It's not disputed. They took Mr. Woodstock's deposition. They took Mr. Corrales and Mr. Roth's deposition. They know how these guys were instructed, and it was very loose. So when you look at the video, your initial reaction is, righteously, they don't point to any particular part of the video. You've got three days of video. You could sit there and fall asleep in most of it because they're going around doing this and that, and you can't tell what's going on. You don't know what's going on. No one knows but these guys. And so my point here is in response to your question, you should have asked some questions. You got some video. You got an email. Legit, hey, you better check these guys out. Even if they should have asked some questions or it would have been a reasonable thing for somebody to ask questions, that is not proof of racial discrimination or retaliation for whistleblowing. Then you have to go to this man and his method of doing business. You have to go to Mr. Frazier's way of doing business. Mr. Frazier's operation is if I have to set somebody up and sneakily get them in trouble, I will do that rather than go through the normal process. But that process involved basically recusing himself from the investigation, assigning a Hispanic supervisor Arroyo to do so, hired an outside consultant to do the surveillance. That doesn't exactly sound like somebody who's decided to get them. And you're making the defense jury argument. That's the argument. I don't see the dispute. I don't see the dispute of fact. Well, here's a dispute. Was Mr. Frazier motivated in any way by race? But he wasn't the ultimate decision maker, so would it matter? Well, that's an argument. That's a jury argument as well. In other words, this man says in his deposition at various points. That's a jury argument or a question of law? It's a question of fact. He says I wasn't involved at all, Judge Tashima. He says. Well, that's not controverted. Why is it a question of fact? I mean, there's a part of me that will sit there and take a look at that, but they did not give me that opportunity. And that's not the only reference in his deposition that he was involved in the decision. And the cat's paw theory that this Court has endorsed numerous times would say that if Mr. Frazier is involved in any way in the decision making process, then he can be considered a decision maker. And if Mr. Frazier was annoyed and angry and dismissive of these employees because when confronted with the video surveillance of their non-work, they turned around and said, well, you told us we could work that way. It's your fault. And he said, well, that just annoyed me to no end because they were trying to make me responsible. Well, that doesn't sound to me like there's a racial motivation. It sounds like, I mean, there's a motivation there. They didn't like them not taking responsibility, but that doesn't give rise to a claim of racial discrimination. Well, then the Court has got to grapple with the comment about the grease in the sewers. And that's a single, isolated comment that's pretty attenuated. Three different people say Mr. Frazier makes these kinds of comments. They can't give us date as to when the comment was made, but both or all three, Mr. Woodstock, Mr. Perales, and Mr. Roth, all opine that Mr. Frazier has made this comment on several occasions or something like it. Can they recall the exact words? But I would also alert the Court to the fact that Mr. Frazier himself testified in his deposition, and I refer the Court to this, that at a public meeting he made a comment to the effect that in this particular neighborhood, certain people have culinary habits that cause them to throw their grease down the drains. So this comment has been referenced by four separate witnesses in the case, one of which is Mr. Frazier himself. And the key here is could a reasonable juror conclude, not is it overwhelmingly established as a matter of law, or is it predominantly this or that, but is there enough that a reasonable juror could say, you know what, given the one remark, and I think this Court has said that when it comes to direct evidence, you don't need a landslide. You just need something that suggests that a mindset is biased, and that's the nature of our society. People don't go around talking like this up front that they've got racial bias. Counsel, you're down to 40 seconds, but I want to get to the question of the attorney's fees. Can we even review the attorney's fees order? Do you have a final order on the attorney's fees? No. Okay. If you don't have a final order on the attorney's fees, can we review the grant of summary judgment if the case itself as a whole has not been wrapped up? Well, I think you should. I'm not sure technically whether you have to have that. I didn't see a brief by the parties. We did not specifically address that point, and if you noticed in this record, I felt like I didn't have any choice. It's time to get on with it. I asked the district court over a series of questions. So do you have a final judgment? You have a decision on summary judgment. Do you have a final judgment? Do you have a piece of paper? Is there anything that says final judgment has been issued? All I know, all I know, Your Honor, is we got the ruling by the underlying summary judgment. The attorney's fees thing went on and on and on, and then Judge Larson, as you know, stepped down, and we could not get the case reassigned to anybody to make that decision. And I kind of felt like if this thing's going to drift, and I – So you simply filed a notice of appeal? I filed a notice of appeal. So no other judge after Judge Larson has been involved with this? Well, been involved. No one has actually addressed or ruled on the attorney's fees thing. Is the case assigned to someone? It's on appeal, so it's not assigned to someone? Well, it got assigned, Judge Benchvango, it got assigned to the presiding judge in the central district, who I think is Judge Collins, and she said, okay, I'm going to take care of you guys. I don't know if we put all these letters before you. I think I did some of them. We're going to take care of this, and then we harangued her a little bit as carefully as we could without, you know, evoking any kind of response, but nothing, nothing, nothing. And finally I said, hey, this thing could drift on and on. And so I said to the Ninth Circuit mediator, hey, you know, I think we ought to get a briefing scheduled, and she said, cool, let's do that, and that's why we're here. Okay, but you don't actually have anything that you can point to as a final judgment on the case, either on the merits or on the attorney's fees. I guess not. And you don't know, and I'm asking this, this is not a trick question, I'm trying to figure this out myself, whether we can have a final judgment when we have a temporary ruling on attorney's fees without a final ruling on attorney's fees. You know, I don't know the answer to that question, frankly. Okay. I just don't know. My assumption was you can't let this thing go on and on and on. But you also didn't seek an interim, permission for an interim appeal either. I didn't even know that that thing existed. Yes, I think it's 1292. You've appealed under 1291, which is the final order. 1292 is the one where you ask for district court certification. It would have been a little awkward here with Judge Larson stepping down and not having been reassigned. There is a procedure for an interim appeal. Okay. Okay, thank you, Mr. Woodson. I will, Mr. Woodson, I am going to allow you, we've taken over your time, I'm going to allow you a minute for rebuttal. May it please the Court. Kira Klatchko for the athletes. First, let me address some of Judge Benchmango's questions and then go to the attorney's fees issue. What you notably did not hear in the first part of counsel's comments, for actually quite a long time until your questions were raised, was any mention of racial discrimination, retaliation, protected conduct. There's just no nexus here. And as you point out, Your Honor, the plaintiffs were filling out false reports about what they were doing with their time. And whether you see the videos or you see these investigation logs, they're minute to minute. So it explains exactly what everyone's doing from 905 to 910 and from 910 to 915. And for hours, for hours, not for an extra 15-minute break, for hours, you have the collections workers driving to the Dairy Queen, going to the Safeway. This is not an extra few minutes to clean up. That's actually stealing time. These are government employees. And that's a very serious offense. So this issue about progressive discipline is frankly a non-issue and it certainly has nothing to do with discrimination. If there's some other claim there it wasn't raised. It's not discrimination. It's not racially motivated. It's stealing time and hours and hours and hours of time. So it's quite significant. In terms of the ultimate decision-maker question, and I think Judge Bybee pointed this out as well, Mr. Frazier, I mean, it's in all the depositions. It's even in some of the plaintiff appellant's depositions, was not involved in the ultimate decision. He was not involved in the ultimate decision. If he had a racial bias, and it's not really clear that he did have a racial bias, but if he had one, he was not the decision-maker in this case. It was not his decision to investigate. It was not his decision to go out and hire the investigations firm. All of the people involved, and as Your Honor points out, Mr. Arroyo made that decision and was Hispanic. All of the people who were involved, there's no mention that they had any racial animus or motivation whatsoever. So the only evidence at all of any racial animus is this comment that supposedly was made by Mr. Frazier about grease in drains. It wasn't made to the appellants. It wasn't made about them. It wasn't made in their presence. It was probably made years before any of this happened. And when it was discovered that they were literally stealing time, they had their skelly hearing. Mr. Frazier didn't participate in that. They were not contrite. They didn't apologize. They didn't explain the behavior because they couldn't. They were caught on video, again, going to the Dairy Queen and eating multiple meals a day and reading the newspaper. So the idea that somehow there's a racial connection here is really not borne out whatsoever by any of the evidence. In terms of the attorney fee issue, I was not involved in this case initially, but I think Your Honor raises a good point about the final judgment. I do, however, think that this is a very strange case where the parties have repeatedly asked for a final ruling on the amount of attorneys' fees. That said, the amount of the fees is separable from the entitlement to fees, and it would seem that this Court could resolve the issue of entitlement separate from amount. And unfortunately, that would be a separate appeal. That does happen occasionally where you get a judgment stating entitlement to fees and that the parties are on subsequent fees. So do you have a final judgment? It would appear, Your Honor, that no one will do anything with the case to issue any paper that says final judgment. But Judge Larson didn't issue one on his way out the door. Judge Larson And nobody else did either. No, Your Honor. So it's a strange case, and I do think What we have is a decision on summary judgment which would suggest that if it resolved all the issues in the case, that a final judgment could have been issued. Yes. But we don't really know. And we have an award of attorneys' fees, but no amount has ever been calculated. Yes, Your Honor. That's correct. Which would mean that theoretically if the amount were at issue, there would be another appeal just on the amount. If we don't have a final judgment here and nobody sought a certification of an interim appeal, I believe it's 1292. It is, Your Honor. Doesn't that mean that we're without jurisdiction under 1291? I would say the Court has the power to construe this order as a final judgment because it does resolve all of the issues, regardless of the fact that it does not address, and it was two separate orders. I don't mean to be flip. But how do we know that, that it resolves all the issues? I mean, that's sort of the problem. That's one of the reasons we want a final judgment, is the district court's opportunity to say, as far as I'm concerned, all of the issues, and as far as I can tell, all of the issues have been resolved. Yes, that's a good question, Your Honor. I think it resolves each and every cause of action, and it deals with fees. The fee issue, again, and this is a statutory fee issue based on that the case was brought or maintained maliciously or without causation or justification. What remains to be done with the attorney's fees? Only the amount, Your Honor. Did the parties file? Did the city file what the district court asked for, which was sort of your hourly rates, how many hours you spent on it, and so on? I believe so, and I believe that that was brought to the attention several times, if I'm not mistaken, of the presiding judge for the central district, and no action was taken. It's possible that was because an appeal was pending. It's also possible it sort of fell through the cracks because it is, as I'm sure you understand, difficult to award an amount of attorney's fees when you are not the one to determine that attorney's fees were warranted and didn't handle the entirety of the case. But I would submit to the court that you do have the discretion to presume that this is a final order and is equivalent to a final judgment, and that the attorney's fees order was either a post-judgment appealable order in terms of just dealing with entitlement to fees, and that any appeal subsequent dealing with the amount of fees would be a post-judgment order that would be immediately appealable. If there are no other questions, I would submit. Your Honor, thank you very much. Thank you very much, Your Honors. Mr. Woodson. Thank you, Your Honor. We'll record in a minute, I guess. Thank you. Mr. Woodstock says that Mr. Frazier said to him in his presence, we wouldn't have a Greece problem if the Mexican people would know how to dispose of their Greece or something to that effect, which I found offensive. And that's not the only time. He refers to another time where a similar comment was made, but he was not as precise about what was said. Mr. Perales says, I reviewed Mr. Woodstock's deposition. Mr. Frazier said the same kind of thing. He didn't say exactly the same thing to me many times. Mr. Roth said essentially the same. And the reason I'm bringing this up is that and the Bales and Ruebottom treatment, who are Caucasian guys, Bales gets two years of progressive discipline. And Mr. Bales' conduct, I would say, far exceeds anything these men are accused of, whether you want to call it stealing time or fraud or whatever. If you look at the accusations against Mr. Bales, there are repeated four or five acts of insubordination. That's the kind of thing that companies are authorized to terminate you on the And that Mr. Bales' warning memo is replete with all that. The reason I mention this again is because Judge Larson's attorney's fee order said by the end of discovery it should have been very clear to you this is frivolous. This whole case totally lacks merit, should never have been brought. I had no way of knowing what Mr. Frazier was going to say. We strongly believed he was the decision maker for lots of reasons before the case was filed, but after he said so many things in his deposition and Mr. Arroyo affirmed, he had to be involved in the decision. We have an NPDES permit that requires him to be involved in deciding who goes or who comes out of his department. And even if you look at the defendant's brief in this case, they make repeated references to Mr. Frazier saying, I was involved in the decision. I made recommendations throughout the process, he says. Periodic recommendations throughout the process. That sure sounds like he's involved in the decision. At least a reasonable juror could so conclude. And I think that's the test. Okay. Thank you very much. I thank both counsel for the argument. The case is submitted. And with that, we have completed the docket for the day and for the week. The Court stands adjourned.
judges: Bencivengo, Tashima, Bybee